AMOCO PIPELINE COMPANY,
a Maine Corporation,
Respondent,

v.

MINNESOTA VALLEY LANDSCAPING,
INC., Appellant,

v.

YOUNG MEN'S CHRISTIAN ASSOCIATION OF METROPOLITAN MINNEAPOLIS, Appellant.

No. CX–90–2050.

Supreme Court of Minnesota.

March 13, 1992.

Kevin P. Keenan, Gregory W. Deckert, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for Minnesota Valley Landscaping, Inc.

Richard P. Mahoney, Victor E. Lund, Mahoney, Dougherty & Mahoney, Minneapolis, for Young Men's Christian Association.

Daniel A. Haws, Michael S. Ryan, Murnane, Conlin, White, Brandt & Hoffman, St. Paul, for respondent.

KEITH, Chief Justice.

The issue in this case is whether Minn. Stat. § 116I.07, subd. 1 shields the appellants from liability for damages caused when employees of Minnesota Valley Landscaping, Inc., while excavating trees on property owned by the Young Men's Christian Association of Minneapolis, Minnesota, ruptured a pipeline owned by Amoco Pipeline Company. We hold that the statute does not provide such protection in this case and affirm the court of appeals.

In 1963, the Young Men's Christian Association of Metropolitan Minneapolis (YMCA) received a donation of farmland southwest of Monticello, Minnesota, which it used as a campsite. The prior owner, Lehigh Portland Cement Co., had granted Amoco Pipeline Company (Amoco) an easement to construct and maintain a gasoline pipeline across the northeast portion of the property. This pipeline was installed by Amoco in the late 1940s or early 1950s.

After acquiring the original tract, the YMCA expanded its holdings by acquiring neighboring farms. Beginning in 1965, the YMCA commenced a tree planting program to improve the aesthetic quality of the property, to preserve the soil and to provide a border along the roadway on the north side of the property. Although thousands of trees were planted, the YMCA did not intend to sell those trees.

Employees of the YMCA were aware that the pipeline crossed the property although they did not know the exact location. On one occasion, a portion of the pipeline was exposed by erosion. Amoco recovered the exposed portion after notification by employees of the YMCA.

Minnesota Valley Landscaping (MVL) is engaged in the business of landscaping residential and commercial properties. Part of its operation consists of purchasing, harvesting, and transplanting trees from other properties to properties of its clients. In early 1985, MVL and the YMCA entered into a purchase agreement whereby MVL was permitted to remove trees from the camp property for transplanting. MVL employees were advised by the YMCA employees of the existence of the pipeline. Although MVL's policy was to locate a pipeline when the landowner did not know the exact location on the property, this was never done in this case.

In May 1985, MVL, using a truck-loaded hydraulically operated 85 inch tree spade, started to remove trees for transplanting. The tree spade would dig a hole four and a half to five feet deep and seven feet wide. A bulldozer was used to fill in the holes after the trees were removed. Over the next 16 months, the company removed and transplanted over 500 trees. On September 26, 1986, the tree spade, operated by an MVL employee, struck and ruptured the pipeline on the YMCA property. Approximately 20,000 gallons of unleaded gasoline were released, contaminating the soil and groundwater in the area. Damages to date, including the cost of clean-up, exceed $525,000.

On November 23, 1987, Amoco brought suit for damages against MVL, alleging trespass, nuisance and negligence. MVL brought a third-party action against the YMCA for indemnification and contribution based on the YMCA's negligence. After extensive discovery, all parties made motions for summary judgment. The trial court denied Amoco's motions. It granted MVL a partial summary judgment, finding that MVL and the YMCA were engaged in the ordinary conduct of agricultural opera-

tions pursuant to Minn.Stat. § 116I.07 on the date the pipeline was ruptured but denied MVL's motion based on gross negligence as a matter of law. It granted the YMCA's motion and dismissed MVL's third party complaint, finding that YMCA's conduct concerning the selling of the trees was not grossly negligent as a matter of law. The court of appeals reversed and held that neither MVL nor the YMCA was "engaged in the ordinary conduct of agricultural operations" and, therefore, their liability was not limited by Minn.Stat. § 116I.07. *Amoco Pipeline Co. v. Minnesota Valley Landscaping, Inc.*, 467 N.W.2d 351 (Minn. App.1991). Both MVL and YMCA appeal.

■ Was MVL engaged "in the ordinary conduct of agricultural operations" pursuant to Minn.Stat. § 116I.07 when it ruptured the pipeline while harvesting trees on the YMCA property? The statute in relevant part states:

> Any owner or lessee of any real property or any person acting with the authority of that owner or lessee who, in the ordinary conduct of agricultural operations upon that property, causes any injury to any underground pipeline, shall not be liable for any of the direct or incidental costs of repairing, restoring or replacing the pipeline in the absence of a showing of gross negligence or willful or wanton misconduct.
>
> "Ordinary conduct of agricultural operations", as that term is used in this subdivision, does not include well drilling or other excavation but includes the installation or repair of agricultural drainage tile subject to the provisions of subdivision 2.

Minn.Stat. § 116I.07, subd. 1 (1990).

Amoco argues this statute applies only to the ordinary farmer or rancher. MVL and the YMCA, on behalf of MVL, argue that the limitation of liability is not restricted to the family farmer because agricultural operation is unambiguously broad and includes tree harvesting.

The statute does not define "agricultural operations." Under the canons of statutory construction, words and phrases are construed "according to their common and

approved usage * * *." Minn.Stat. § 645.-08, subd. 1 (1990). The word "agriculture" has both a narrow and a broad meaning. In its narrow sense it is:

> The art or science of cultivating the ground, and raising and harvesting crops, often including also feeding, breeding, and management of livestock; tillage; husbandry; farming.

Webster's New International Dictionary 52 (2d ed. 1960). In its broader sense, it is:

> [T]he science and art of the production of plants and animals useful to man, including to a variable extent the preparation of these products for man's use and their disposal by marketing or otherwise. In this broad use it includes farming, horticulture, forestry, dairying, sugar making, etc.

*Id.*

"Operation" is defined as an "act, process, or effect of operating." *Id.* at 1707.

To support their argument that the statute encompasses the broad view of "agriculture," MVL and the YMCA cite statutes with similar terms. For example, the act governing the Minnesota Department of Agriculture states:

> "Agricultural use" means use of land for the production of livestock, dairy animals, dairy products, poultry and poultry products, fur bearing animals, horticultural and *nursery stock.... Wetlands, pasture and woodlands accompanying land in agricultural use shall be considered to be in agricultural use.*

Minn.Stat. § 17.81, subd. 4 (1990) (emphasis added).

We believe a broad definition of agriculture to include forestry and nursery activities is supported by the common usage of the word as well as by statutes which define agriculture. Had the legislature intended to limit liability only for farmers, it could have used the words "farms" or "farming." The legislature has, in other statutes, used the word "farming" when it intended to legislate only for farms. See Minn.Stat. ch. 41, entitled "Family Farm Security Program."

Although we consider "agricultural operations" to include some forestry activities, that term, as used in the statute, does not include an operation involving the digging up of hundreds of grown trees for transplanting. This is particularly true where the trees were planted to stay on the land, and there was no intention to harvest the trees, at least not by excavation. We believe that digging holes to a depth of four and a half to five feet and at a width of seven feet to remove these trees, is not within "the ordinary conduct of agricultural operations."

Significantly, the statute appears in Chapter 116I which deals with the general topic of pipelines. The legislative purpose was to encourage reporting of damage to underground pipelines by limiting farmer liability. The legislature never intended to limit liability for a forestry activity involving the wholesale digging of holes five feet deep by seven feet wide.

Even though we believe the term "agricultural operations" deserves a broad interpretation, we conclude in this case that the digging up of the grown trees does not come within the *"ordinary conduct* of agricultural operations" as that phrase is used in the statute; rather, the digging that was involved here constituted the kind of "other excavation" which is outside the kind of ordinary forestry operations the statute has in mind.

Affirmed.